UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ESTHER L. MANSON,

               Plaintiff,                  Civil Action No. 2:12-CV-11473

       v.                             District Judge  Avern Cohn
                                        Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

               Defendant.
_____/

**REPORT AND RECOMMENDATION TO**
**GRANT PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [12] AND**
**DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [16]**

Plaintiff Esther L. Manson appeals Defendant Commissioner of Social Security's ("Commissioner") denial of her application for disability insurance benefits. (*See* Dkt. 1, Compl.) Before the Court for a report and recommendation (Dkt. 5) are the parties' cross-motions for summary judgment (Dkts. 12, 16). For the reasons set forth below, this Court finds that remand is required so that the ALJ may (1) call a medical advisor or otherwise secure additional evidence by which to properly infer Manson's disability onset date, and (2) obtain an expert opinion regarding whether the listings for mental disorders, including Listing 12.04, have been met. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 16) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

**I.  BACKGROUND**

Manson was 42 years old on the alleged onset date and 45 years old on the date last insured.

(*See* Tr. 151-52.) She completed high school. (Tr. 162.) Manson has worked as a mail and freight handler, park forestry laborer, and nurse's aide. (Tr. 173.) She has not worked since 2002. (Tr. 150, 156, 173.)

Manson alleged that she stopped working because she "was mentally unable to continue to work." (Tr. 156.) She applied for disability based on the following conditions: "Learning disability, arthritis, diabetes, high blood pressure, dyslexia, bip[ol]ar, schizophrenia, scratches the skin from her body until she bleeds, carpal tunnel, poor blood circulation, feet fall asleep." (*Id.*) She stated that her conditions limit her ability to work because "I am in pain constantly. I can't stand or sit for long. I have a lot of trouble walking. I read at a 3rd grade level and I have a lot of trouble understanding." (*Id.*)

### A. Procedural History

The present case concerns Manson's application for disability insurance benefits ("DIB") filed on February 5, 2009. (Tr. 11, 142.) Manson previously filed an application for DIB that the Commissioner denied on March 15, 2005. (Tr. 152.) In February 2009, Manson applied for both DIB and Supplemental Security Income ("SSI"). (Tr. 30, 47.) On September 11, 2009, the application for DIB was initially denied, but the concurrent claim for SSI was granted. (Tr. 30, 47.)[1]

Plaintiff requested an administrative hearing regarding her DIB claim, and on August 9, 2010, she appeared with counsel before Administrative Law Judge ("ALJ") James Mitchell. (Tr. 27-39.) At the hearing, Manson's representative informed the ALJ that Manson was currently receiving

---

[1] SSI, unlike DIB, is not dependent on insured status. For DIB, a claimant must establish disability on or before his or her date last insured ("DLI"), which is based on the claimant's earnings record. *See* 42 U.S.C. § 423(c); 20 C.F.R. § 404.130. Thus, a claimant may be able to establish disability for SSI but not DIB.

SSI and that she had a prior denied claim for DIB that she wished to reopen. (Tr. 30-32.) Manson requested that the ALJ consider only the period from October 1, 2004, (the alleged onset date) to December 31, 2007, (her date last insured) so that her SSI would not be affected by his decision. (Tr. 33-35.) ALJ Mitchell continued the hearing so that Manson's attorney could provide a brief addressing the procedural issues. (Tr. 38.) On October 15, 2010, Manson and her representative appeared again at a hearing before ALJ Mitchell. (Tr. 40-46.) Because of the narrow scope of review, Manson agreed to waive testimony. (Tr. 44.)

In a February 8, 2011 decision, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act. (*See* Tr. 11-18.) The ALJ's decision became the final decision of the Commissioner on January 24, 2012, when the Social Security Administration's Appeals Council denied Plaintiff's request for review. (Tr. 1.) Plaintiff filed this suit on April 2, 2012. (Dkt. 1, Compl.)

### B. Medical Evidence

The decision under review addresses only the period from October 1, 2004, to December 31, 2007. The following summary includes only evidence that dates to that period or that could be relevant to determine Manson's impairments and functioning during that period.

#### 1. Evidence Regarding Mental Impairments

On September 8, 2004, a psychological examiner for Michigan Rehabilitative Services, James Briesmeister, Ph. D.,  performed a "projective test battery to determine [Manson's] intellectual and academic abilities" and to "assess her occupational interests and aptitudes." (Tr. 333.) Dr. Briesmeister diagnosed cocaine/crack dependence and polysubstance dependence in remission; dysthymic disorder, early onset; developmental reading disorder/dyslexia; developmental

3

arithmetic disorder; and disorder of spelling and written expression. (Tr. 337.)

Dr. Briesmeister found that she was "intellectually functioning within the low average range." (Tr. 339.) Specifically, her "fund of general knowledge and academic information," "short term memory and attention span," "comprehension of mental math," and "verbal-linguistic logic and abstract reasoning" were "within the low average range." (Tr. 335.) Her "social comprehension [was] within the low average to average ranges"; she was "able to work independently on routine and familiar tasks," but "she tend[ed] to be unsure of herself," and therefore Dr. Briesmeister concluded "she may not be a good candidate for the pressures of managerial, supervisory, or decision-making responsibilities." (*Id.*) He also noted that "[h]er spatial relations skills and hand-eye coordination [were] within the low average range, "[h]er motor speed [was] also within the high borderline to low average ranges," and she "work[ed] slowly with her hands and her manual dexterity [was] somewhat below average," so she was "better suited for rote and gross jobs rather than tasks that require manual dexterity and a rapid rate of production." (*Id.*)

Regarding Manson's depression, Dr. Briesmeister wrote that "[t]he test results suggest that the depression may be chronic," it "appear[ed] to be persistent and pervasive," and "it may negatively impact upon her overall functioning and performance." (Tr. 336.) He noted that "[i]ntense work-related pressures could exacerbate her current levels of depression and place her at risk for potential drug relapse." (Tr. 337.)

Dr. Briesmeister concluded that "[b]ecause of significant learning disabilities, Ms. Manson needs a routine, entry-level, and low stress job." (Tr. 337.) Because "[s]he lacks self-assurance," he wrote, "she needs a job that is academically undemanding" and "should also avoid high stress jobs." (*Id.*) In particular, "[d]ue to significant lags in spelling and reading, she may find secretarial,

4

computer, or desk clerk jobs too challenging." (Tr. 339.) On the other hand, he found her to be "a genuine and pleasant individual" who "seemed eager to succeed on the various tests" and "worked in a deliberate manner and appeared invested in her test performance." (Tr. 337.) Dr. Briesmeister's examination took place about three weeks before the October 1, 2004 alleged onset date.

The records from Hegira Programs, Inc., where Manson received mental health treatment, are dated January 11, 2008, to August 12, 2010; they begin less than two weeks after the December 31, 2007 date last insured. (*See* Tr. 298-314, 530-65, 567-68.) On a January 11, 2008 intake form completed by a therapist and reviewed and signed by John Head, D.O., the diagnoses identified were Schizoaffective Disorder[2] and Alcohol Abuse. (Tr. 563-64.) The intake form records that Manson's response when asked about the "Duration of Emotional/Behavioral Symptoms," was "[a]ll my life." (Tr. 550.) The "Clinical (Emotional and Behavioral) Symptoms" section of the intake form reports that according to Manson:

> [Client] had been to [treatment] at Hegira, meds helped her sleep, [client] reports hard time dealing w/stress + ignores it but states it explodes into anger, "It gets confusing." [Client] will get depressed, overeating, lack of interest, mood swings, crying spells, racing thoughts, obsessive thoughts, compulsive behavior, social isolation—to keep from being angry, visual hallucinations, audio hallucinations, paranoid thoughts.

(*Id.*) The intake form also reports for "Identifiable Precipitant(s)/Stressor(s)": "when mother started going blind everything went downhill—1986." (*Id.*) On the Alcohol/Drug Assessment portion of

---

[2] Schizoaffective Disorder is "a disorder in which a mood episode and the active-phase symptoms of Schizophrenia occur together and were preceded or are followed by at least 2 weeks of delusions or hallucinations without prominent mood symptoms." American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* 298 (4th ed., Text Revision 2000) ("*DSM–IV*"). Schizophrenia "is a disorder that lasts for at least 6 months and includes at least 1 month of active-phase symptoms (i.e., two or more of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms)." *Id.*

the intake form, Manson's "last use" of crack cocaine is identified as "age 42," which was Manson's age on the alleged onset date. (*See* Tr. 557.) The "Psychiatric Treatment History" section lists outpatient counseling at Hegira in 2006, which falls within the relevant period. (Tr. 558.) The "History of Suicide Attempt(s)" section reports "multiple times" using "pills" in September 2007, also within the relevant period. (Tr. 561.)

For the most part, the rest of the Hegira records do not expressly relate to the period at issue. A May 7, 2009 letter from a Hegira therapist to the Michigan Department of Human Services states that Manson received a psychiatric evaluation and was diagnosed with schizoaffective disorder, but gives no indication of how long the condition has been present. (Tr. 302.) A form completed by Manson's therapist for her session on January 20, 2008, indicates under "Substance Use": "h[istory] of crack cocaine/diet pills 3-4 years ago." (Tr. 314.) Notes from a March 2009 session indicate that Manson had been living at a boarding house since October 27, 2007, and that she had used cocaine around May 2007. (Tr. 308.) Also at that session, Manson reported a history of three to four suicide attempts, the last one 10 months prior, which would be around July 2008. (*See id.*)

At the request of Disability Determination Services, psychiatrist Basivi Baddigan examined Manson on August 24, 2009, more than a year and a half after the December 31, 2007 date last insured. (Tr. 322-25.) Dr. Baddigan reported that Manson told him she had been hearing voices for the past 20 years and had been feeling depressed on and off for the past 20 years. (Tr. 322.) Dr. Baddigan also reported that Manson had paranoid ideations for 20 years. (Tr. 323.) Dr. Baddigan diagnosed Manson with schizoaffective disorder, depressed type, in partial remission, but did not indicate how long he believed her condition had existed. (Tr. 324.) His conclusion that Manson "is unable to work" was expressly limited to "the present t[im]e." (*Id.*)

6

### 2. Evidence Regarding Physical Impairments

Manson's medical records from Garden City Medical Center include examination findings, test results, and x-ray findings from the October 2004 to December 2007 period.

On January 4, 2005, examination notes from Garden City Medical Center reported that Manson was experiencing paresthesia in her tongue, knee pain, ankle swelling, and redness and itching "scattered through body." (Tr. 294.) Prescriptions given included Atarax,[3] and Manson was scheduled for EMG[4] of her extremities. (*Id.*) It was noted that Manson "lives by herself." (*Id.*)

On January 22, 2005, electrodiagnostic studies of Manson's upper and lower extremities were performed to investigate her "history of burning sensation in arms and legs over past year and one half." (Tr. 291.) Elizabeth W. Edmond, M.D., interpreted the results, concluding: "Referable to the median nerves, with no evidence of any membrane instability (denervation) of thenar muscle groups, findings are more compatible with that of an entrapment of the median nerves at the wrists, though cannot exclude a generalized median neuropathy." (Tr. 292.)

On March 7, 2005, examination notes from Garden City Medical Center included the following diagnoses: dermatitis, pedal edema, obesity, and median neuropathy. (Tr. 288.) Prescriptions included Lasix,[5] Atarax, and a wrist brace. (*Id.*)

---

[3] Atarax or Hydroxyzine hydrochloride "is effective in the treatment of chronic urticaria, dermatitis, and histamine-mediated pruritus," and "is also effective as an antiemetic, for relief of anxiety and tension, and as a sedative." *See* U.S. National Library of Medicine, National Institutes of Health, Drug Information Portal, http://druginfo.nlm.nih.gov/drugportal/ (last updated May 2013) ("NLM Drug Information Portal").

[4] An EMG or electromyogram is a visual and sound record of electric waves associated with activity of skeletal muscle that is used in the diagnosis of neuromuscular disorders. *Webster's Third New International Dictionary, Unabridged* (2002).

[5] Lasix or Furosemide is "is a diuretic with fast onset and short duration that is used for edema and chronic renal insufficiency." *See* NLM Drug Information Portal.

On July 7, 2005, examination notes from Garden City Medical Center included the following diagnoses: elevated blood pressure, pedal edema, and obesity. (Tr. 287.) Prescriptions included Lasix, Atarax, and Bactrim DS.[6] (*Id.*)

On July 15, 2005, examination notes from Garden City Medical Center include the following diagnoses: dermatitis, morbid obesity, and hypertension. (Tr. 285.) Hydroxyzine[7] was prescribed. (*Id.*) A referral to rheumatologist Joel Shavell was given. (*Id.*)

An August 24, 2005 letter from Dr. Shavell to Sarah Jacob, M.D., indicates that Dr. Jacob referred Manson to Dr. Shavell after Manson complained of "pain in her joints, pain in her back, pain in her legs, sore, stiff, cannot move, clicking, popping and all kinds of nonspecific complaints including burning at one time which required an EMG and nothing was found." (Tr. 284.) Upon physical examination, Dr. Shavell determined that Manson was "basically doing well" with "no muscle weakness," "no bowel complaints," "no chest pain or shortness of breath." (*Id.*) Dr. Shavell noted that "[s]he does complain of itching" and apparently told him "[s]he has been itching since the year 2000." (*Id.*) Dr. Shavell determined that Manson did not have lupus, and her joint pain was "not that of arthralgias or arthritis." (*Id.*) He noted that her weight was over 300 pounds, and "[i]t was very hard to maneuver this lady because of the extreme weight." (*Id.*) Dr. Shavell found it "interesting" that she had "a history of hepatitis." (*Id.*) He recommended further testing. (*Id.*)

December 28, 2005 examination notes from Garden City Medical Center include the

---

[6] Bactrim DS or Sulfamethoxazole mixture with trimethoprim "is effective in the treatment of many infections." *See* NLM Drug Information Portal.

[7] Hydroxyzine "is effective in the treatment of chronic urticaria, dermatitis, and histamine-mediated pruritus" and "is also effective as an antiemetic, for relief of anxiety and tension, and as a sedative." *See* NLM Drug Information Portal.

following diagnoses: uncontrolled hypertension, dermatitis, obesity, and dyslipidemia. (Tr. 278.) Prescriptions included Atarax and Bactrim DS. (*Id.*) A Lasix injection was given. (*Id.*)

October 26, 2006 examination notes from Garden City Medical Center are largely illegible but include a medication list that includes HCTZ,[8] Lorcet,[9] and Atarax. (Tr. 277.)

July 6, 2006 examination notes from Garden City Medical Center report that Manson woke up with her right leg "locked" and experienced pain from the right hip down to the right leg for two days, with improvement from Advil. (Tr. 267.) Manson's Atarax was refilled. An x-ray of the right hip the same day revealed "degenerative changes" but no fracture or dislocation. (Tr. 276.)

March 8, 2007 examination notes from Garden City Medical Center include the following diagnoses: hypertension, chest pain, and morbid obesity. (Tr. 260.) Medications prescribed included Lorcet, Dyazide,[10] and Atarax. (*Id.*)

A chart listing Manson's medications indicates that she was prescribed Atarax on April 17, 2006, and Atarax, Lorcet, and HCTZ on December 28, 2007. (Tr. 222.)

December 28, 2007 examination notes from Garden City Medical center report arthritis in the left foot, pain in the right calf, chronic pain, and blurry vision. (Tr. 254.) An x-ray of Manson's right foot on the same day revealed "severe degenerative changes" but no fracture or dislocation. (Tr. 259.)

---

[8] HCTZ or hydrochlorothiazide is used in the treatment of several disorders including edema, hypertension, diabetes insipidus, and hypoparathyroidism. *See* NLM Drug Information Portal.

[9] Lorcet is an Acetaminophen mixture with Hydrocodone bitartrate, a narcotic analgesic. *See* NLM Drug Information Portal.

[10] Dyazide is a Hydrochlorothiazide mixture with Triamterene. Hydrochlorothiazide is a diuretic used in the treatment of several disorders including edema, hypertension, diabetes insipidus, and hypoparathyroidism. Triamterene inhibits sodium reabsorption. *See* NLM Drug Information Portal.

On January 4, 2008, just after the date last insured, an ultrasound of Manson's lower extremities was taken to assess possible deep vein thrombosis and leg edema, but findings were normal. (Tr. 253.) On January 7, 2008, an ultrasound of Manson's lower extremities was taken because of pain in her right calf, but again, findings were normal. (Tr. 249.)[11]

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits (for qualifying wage earners who become disabled prior to expiration of their insured status) and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

---

[11] In 2009, Manson was diagnosed with and treated for deep venous thrombosis in the right lower extremity and bilateral pulmonary embolisms. (Tr. 451, 466, 472, 475, 479, 495-96.)

10

    4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

    5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

    At step one, ALJ Mitchell found that Plaintiff had not engaged in substantial gainful activity since the alleged disability onset date of October 1, 2004. (Tr. 13.) At step two, he found that Plaintiff had the following severe impairments: median neuropathy, obesity, hypertension, and dysthymic disorder. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 13-14.) Between steps three and four, the ALJ determined that Plaintiff had the residual functional capacity to "perform a wide range of sedentary work as defined in 20 CFR 404.1567(b)[12] except she could perform only simple routine

---

    [12] Sedentary work is defined in 20 C.F.R. § 404.1567(a), not 20 C.F.R. § 404.1567(b), which defines light work. According to 20 C.F.R. § 404.1567(a), "[s]edentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." Social Security Ruling 83-10 adds that " periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday." Social Security Rulings are "binding on all components of the Social Security Administration." 20 C.F.R. § 402.35(b)(1); *Heckler v. Edwards*, 465 US 870, 873 n.3 (1984).

tasks." (Tr. 14-16.)[13] At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. 16.) At step five, relying on Section 201.00(h)(1) of the Medical-Vocational Guidelines, or the "grids," the ALJ found that sufficient jobs existed in the national economy for someone of Plaintiff's age, education, work experience, and residual functional capacity. (Tr. 17.) The ALJ therefore concluded that Plaintiff was not disabled as defined by the Social Security Act from the alleged onset date through the date of his decision. (Tr. 17.)

## III.  STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th

---

[13] As Manson points out, the ALJ's decision inconsistently identifies the exertional level of Manson's RFC; he stated she was limited to sedentary work on page 14 but light work on pages 16 and 17. (*See* Pl.'s Mot. Summ. J. at 13 n.7.) Regardless, the Grids direct a finding of not disabled for a younger individual with a high school education who can perform a full range of light or sedentary work. 20 C.F.R. Part 404, Subpart P, Appendix 2 § 201.17, Table 1.

Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV. ANALYSIS

### A. The ALJ Failed to Properly Infer an Onset Date.

Manson argues that the ALJ's finding at step two that her learning disability, dyslexia, bipolar disorder, schizophrenia, schizoaffective disorder, arthritis, diabetes, and poor circulation were non-severe was not supported by substantial evidence, and that this error was harmful because "as a result, the ALJ entirely dismissed discussion of all such impairments, failing to consider their combined effect," which led to "an incomplete RFC and erroneous reliance of the Grid Rules at Step Five." (Pl.'s Mot. Summ. J. at 6-8.) The Commissioner argues that Plaintiff "overstates the significance of the step two finding" and regardless the ALJ "considered the effects [of] all of

13

Plaintiff's impairments." (Def.'s Mot. Summ. J. at 15.) The Court agrees with the Commissioner that any error in the ALJ's step two finding was harmless, but finds that the ALJ also erred by failing to properly infer an onset date for Manson's impairments, especially schizoaffective disorder—and this error requires remand.

It is well established in Sixth Circuit precedent that when at least one impairment is found severe, it is unnecessary to decide whether the ALJ erred in failing to find other impairments were severe. *See, e.g.*, *Fisk v. Astrue*, 253 F. App'x 580, 584 (6th Cir. 2007); *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987). According to the regulations, upon determining that a claimant has one severe impairment, the ALJ must continue with the remaining steps in the disability evaluation. 20 C.F.R. § 1520(a)(4). The ALJ can, and in fact must, consider all of the claimant's impairments, both severe and non-severe, in completing the evaluation. *See* SSR 96-8p, 1996 WL 374184, at *5 ("In assessing RFC, the adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'"). If the ALJ finds at least one severe impairment and then properly proceeds with the analysis, therefore, any failure to find additional severe impairments at step two cannot constitute reversible error. *See Fisk*, 253 F. App'x at 584*; Maziarz*, 837 F.2d at 244.

Here, ALJ Mitchell found that Manson had four severe impairments: median neuropathy, obesity, hypertension, and dysthymic disorder. (Tr. 13.) Accordingly, he continued with the remaining steps in his disability determination. Since the ALJ was required to consider Manson's learning disability, dyslexia, bipolar disorder, schizophrenia, schizoaffective disorder, arthritis, diabetes, and poor circulation in subsequent steps regardless of his findings at step two, the ALJ's failure to find that those impairments were severe could not constitute reversible error.

14

Nonetheless, the question remains: did the ALJ err by failing to consider Manson's learning disability, dyslexia, bipolar disorder, schizophrenia, schizoaffective disorder, arthritis, diabetes, and poor circulation at subsequent steps?        This Court is troubled by the lack of medical evidence addressing the relevant period—October 1, 2004, (the alleged onset date) to December 31, 2007, (the date last insured)—especially with regard to Manson's diagnosis of schizoaffective disorder. Although the agency obtained consultative physical and psychiatric examinations, they took place more than a year after the DLI and did not address whether and to what extent Manson's impairments began before the DLI, as discussed further below. *See infra* Part IV.C. The onset and chronological progression of Manson's schizoaffective disorder appears to be a crucial issue that was not adequately addressed. Manson was diagnosed with schizoaffective disorder during an intake interview for therapy just two weeks after the DLI (Tr. 563), and the consultative psychiatric examiner who opined, in 2009, that Manson was unable to work, indicated that Manson reported she had been hearing voices, feeling depressed on and off, and having paranoid ideations for 20 years (Tr. 323).

Social Security Ruling 83-20 instructs that "[i]n addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability," and "[i]n many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits." This is such a case. The agency found that Manson was disabled and granted her claim for SSI, but her DIB claim was denied because the ALJ found that "the minimal evidence provided does not support a finding of disability prior to the date last insured." (Tr. 15.)

SSR 83-20 provides specific guidance on determining an onset date when precise evidence

is not available:

> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment(s) occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred. If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.
>
> If reasonable inferences about the progression of the impairment cannot be made on the basis of the evidence in file and additional relevant medical evidence is not available, it may be necessary to explore other sources of documentation. Information may be obtained from family members, friends, and former employers to ascertain why medical evidence is not available for the pertinent period and to furnish additional evidence regarding the course of the individual's condition. . . . The impact of lay evidence on the decision of onset will be limited to the degree it is not contrary to the medical evidence of record. . . .
>
> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). . . . Convincing rationale must be given for the date selected.

SSR 83-20, 1983 WL 31249 at *3.

Here, the ALJ apparently based his finding regarding the onset date on a negative inference; he inferred that Manson was not disabled based on the lack of evidence of disability during the relevant period. (*See* Tr. 15.) But as this Court has previously stated, in the context of interpreting SSR 83-20, the absence of contemporaneous medical records does not preclude a finding of disability. *Houston v. Comm'r of Soc. Sec.*, No. 10-CV-14831, 2011 WL 6152992, at *12 (E.D. Mich. Sept. 30, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2011 WL 6152982

16

(E.D. Mich. Dec. 9, 2011) (O'Meara, J.) (citing *Plumley v. Astrue*, No. 2:09-CV-42, 2010 WL 520271, at *5 (D. Vt. Feb. 9, 2010) ("[A]lthough objective medical evidence is necessary to establish the existence of a disabling impairment, . . . if a claimant has already been found to suffer from a disabling impairment, objective medical evidence, while preferred, is not essential to resolving the onset date of that disability." (internal citations omitted)); *Moriarty v. Astrue*, No. 07–CV–342–SM, 2008 WL 4104139, at *6 (D.N.H. Aug. 28, 2008) ("Nowhere in [SSR 83–20] is there any suggestion that the absence of medical records establishing an onset date is fatal to an individual's disability claim. In fact, the SSR provides just the opposite, specifically noting that in some cases it may be necessary to infer the onset date of a claimant's disability from non-medical evidence.")).

Negative inferences based on lack of medical evidence are especially problematic with respect to mental impairments, which often go undiagnosed and untreated for many years. *See Blankenship*, 874 F.2d at 1124 ("Appellant may have failed to seek psychiatric treatment for his mental condition, but it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation."); *Burton v. Apfel*, 208 F.3d 212 (6th Cir. 2000) (relying on *Blankenship* and holding that the ALJ's finding that claimant had no severe mental impairment was not based on substantial evidence where ALJ's findings were "largely conclusory and based upon negative inferences").

*McClanahan v. Commissioner of Social Security*, 474 F.3d 830 (6th Cir. 2006), does not compel a different result. There, the court found that the ALJ did not err by failing to call a medical expert to infer an onset date. The "medical record was well developed and carefully reviewed by the ALJ" and "the ALJ did elicit testimony relevant to the disability onset date from . . . a psychologist."

17

*Id.* at 837. That is not the case here.

This Court recommends remand so that the ALJ may call a medical advisor or otherwise secure additional evidence in order to properly infer Manson's disability onset date.

**B. An Expert Opinion on Medical Equivalence Is Required at Step Three.**

Manson argues that the ALJ's step three finding that her impairments did not meet or medically equal a listed impairment was not supported by substantial evidence because the ALJ failed to discuss the single decisionmaker's contrary conclusion, failed to obtain a medical expert to appear and evaluate the evidence, and failed to "adequately explicate" his finding that listing 12.04 was not met. (Pl.'s Mot. Summ. J. at 8-10.)

As the Commissioner correctly argues (Def.'s Mot. Summ. J. at 22), the ALJ was not required to consider the conclusion of single decisonmaker ("SDM") William Robbins.[14] Robbins concluded that Manson's "combination of impairments such as morbid obesity and arthritis of the spine and both knees . . . when compared to the requirements called for in Listing 1.02 . . . is found to be medically equivalent." (Tr. 325.) The Social Security Agency's Program Operations Manual System (POMS) states that SDM-completed forms are not opinion evidence at the appeal levels. POMS DI 24510.050C.[15] SDMs generally are not physicians, and are not acceptable medical sources

_____

[14] An SDM is a disability examiner employed by the state Disability Determination Services to "complete all disability determination forms and make initial disability determinations in many cases without medical or psychological consultant (MC or PC) signoff." Program Operations Manual System DI 12015.100.

[15] POMS is "a policy and procedure manual that employees of the Department of Health & Human Services use in evaluating Social Security claims and does not have the force and effect of law," but "it is nevertheless persuasive." *Davis v. Sec'y of Health and Human Servs.*, 867 F.2d 336, 340 (6th Cir.1989); *see also Ferriell v. Comm'r of Soc. Sec.*, 614 F.3d 611, 618 n. 4 (6th Cir.2010) ("though internal manuals like POMS and HALLEX might provide some evidence of the SSA's interpretations of its regulations, they are properly interpreted in light of remarks promulgated by

under 20 C.F.R. § 1513(a). This Court has previously held that an SDM opinion is not substantial

evidence on which an ALJ may base his or her disability determination. *See Munson v. Comm'r of

Soc. Sec.*, 2012 WL 1788584 (E.D. Mich. Apr. 26, 2013) (adopting unpublished report and

recommendation by M.J. Michelson) (Duggan, J.); *accord Maynard v. Astrue*, No. 11-12221, 2012

WL 5471150 (Sep. 11, 2012) (Cohn, J.) (holding ALJ erroneously relied on an SDM opinion);

*Bergschwenger v. Comm'r of Soc. Sec.*, 11-11752, 2012 WL 4009916 (E.D. Mich. Aug. 20, 2012)

(Hluchaniuk, M.J.) (same), *report and recommendation adopted*, 2012 WL 4009909 (E.D. Mich.

Sept. 12, 2012) (Cox, J.).

Manson's second point, that the ALJ erred in failing to obtain a medical expert to appear and

evaluate the evidence, is of greater concern, although neither Manson nor the Commissioner cited

the most relevant authorities. (*See* Pl.'s Mot. Summ. J. at 9-10; Def.'s Mot. Summ. J. at 17-18; Pl.'s

Reply at 4-5.) The Commissioner's own rules appear to require that an expert be consulted. The

agency's regulation provides:

> When we determine if your impairment medically equals a listing, we
> consider all evidence in your case record about your impairment(s)
> and its effects on you that is relevant on this finding. . . . . We also
> consider the opinion given by one or more medical or psychological
> consultants designated by the Commissioner.

20 C.F.R. § 416.926(c). A Social Security Ruling gives further guidance:

> The administrative law judge or Appeals Council is responsible for
> deciding the ultimate legal question whether a listing is met or
> equaled. As trier of the facts, an administrative law judge or the
> Appeals Council is not bound by a finding by a State agency medical
> or psychological consultant or other program physician or
> psychologist as to whether an individual's impairment(s) is
> equivalent in severity to any impairment in the Listing of

the SSA as part of the notice-and-comment procedures resulting in the final rule").

> Impairments. However, longstanding policy requires that the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record as expert opinion evidence and given appropriate weight.

SSR 96-6p, 1996 WL 374180 at *3.

Other courts in this district have held, after lengthy and careful discussion, that remand is required when the record contains no qualified medical expert opinion on the issue of medical equivalence (i.e., whether the plaintiff's impairments are medically equivalent to the SSA's list of impairments it considers to be of sufficient severity as to create a presumption of disability). *See Maynard*, 2012 WL 5471150, at *6;  *Harris v. Comm'r of Soc. Sec.*, No. 12-10387, 2013 WL 1192301, at *6-8 (E.D. Mich. Mar. 22, 2013) (Ludington, J.). As those cases noted, the Seventh Circuit addressed the issue and found that an ALJ's failure to consult a medical expert regarding whether a listing was equaled merits reversal: "Whether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett v. Barnhart*, 381 F.3d 664, 670 (7th Cir. 2004). The Sixth Circuit has not directly addressed the question, but has stated that "[g]enerally, the opinion of a medical expert is required before a determination of medical equivalence is made." *Retka v. Comm'r of Soc. Sec.*, 70 F.3d 1272 (6th Cir. 1995).

The Commissioner argues that "typically an ALJ need not consult a medical expert at step three," citing a Fifth Circuit case, and that "[a]n ALJ is only required to call on a medical expert when the ALJ determines that the record suggests that a finding of medical equivalence may be reasonable or when the ALJ receives additional medical evidence that the ALJ believes may affect the finding of equivalency," citing SSR 96-6p. There is no indication in SSR 96-6p that the

requirement to consult a medical expert applies only in certain circumstances. The Ruling states without qualification that "the judgment of a physician (or psychologist) designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge or the Appeals Council must be received into the record . . . ." SSR 96-6p, 1996 WL 374180 at *3. The Ruling does state that an "updated medical opinion" need be obtained only when the ALJ finds that equivalence may be reasonable or when additional evidence is received, but those conditions apply only where "this opinion has been obtained at the first two levels of administrative review." SSR 96-6p, 1996 WL 374180 at *3.

The Fifth Circuit case also does not support the Commissioner's argument. In *Haywood v. Sullivan*¸ 888 F.2d 1463 (5th Cir. 1989), state agency staff physicians were consulted regarding equivalence at both the initial and the reconsideration stages of her application, and the question before the court was whether the ALJ was required to obtain an updated opinion. 888 F.2d at 1468. In this case, because the single decisionmaker process was used, there was no consultation on equivalence by a physician or psychologist at the initial and reconsideration stages.

The ALJ stated at the outset of his step three discussion that "[n]o treating or examining physician has mentioned findings that meet or are equivalent in severity to the criteria of any listed physical impairment." (Tr. 13.) The record does not contain any "Disability Determination and Transmittal" or "Psychiatric Review Technique" or similar form in which a medical or psychological consultant provided findings on equivalence. *See* SSR 96-6p, 1996 WL 374180 at *3 (identifying some of the forms that suffice to "ensure that this opinion has been obtained"). As in *Harris*, "[n]either the ALJ nor this court possesses the requisite medical expertise to determine if [Plaintiff's] impairments . . . in combination equal one of the Commissioner's listings." 2013 WL

21

1192301, at *8. Accordingly, this court recommends remand so that the ALJ can properly make an equivalency determination after consulting with a Commissioner-appointed medical expert or experts.

Because Manson has alleged mental impairments, an expert opinion regarding whether the listings for mental disorders, including Listing 12.04, have been met must be obtained. This Court recommends remanding for this purpose. Plaintiff's third argument regarding step three, that the ALJ failed to "adequately explicate" his finding that her mental impairments did not meet or medically equal the criteria of listing 12.04, is therefore moot.

**C. The Errors Asserted in the RFC Determination Are Not Persuasive.**

Manson argues that the ALJ's RFC determination was improper because it did not adequately account for (1) Dr. Briesmeister's statement that "due to significant lags in spelling and reading, she may find secretarial, computer, or desk clerk jobs too challenging"; (2) limitations indicated in two August 24, 2009 consultative examinations; (3) Manson's morbid obesity; and (4) Manson's moderate difficulties as to concentration, persistence, and pace. (Pl.'s Mot. Summ. J. at 11-13.)

*First*, as to Manson's arguments that the RFC did not account for Dr. Briesmeister's statement that certain jobs would be "too challenging" "due to significant lags in spelling and reading" and for her moderate difficulties as to concentration, persistence, and pace ("CPP"): the Commissioner argues that the RFC's restriction to "simple and routine tasks" was sufficient. (Def.'s Mot. Summ. J. at 12-13.) But Manson insists that "[p]recedent also establishes that limiting an individual to simple, routine, repetitive, unskilled jobs says nothing about concentration, persistence, and pace" (Pl.'s Mot. Summ. J. at 12), and that "simplicity and a routine nature does not equate to

22

the level of stress, when other factors such as pace of production or interpersonal interaction can cause stress" (Pl.'s Reply at 2 (citing *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287-88 (6th Cir. 2009))).

This Court has previously made clear that the ultimate question is whether substantial evidence supports the ALJ's choice of limitations in the residual functional capacity assessment and corresponding hypothetical, and "there is no bright-line rule requiring remand whenever an ALJ's hypothetical includes a limitation of 'unskilled work' but excludes a moderate limitation in concentration." *Taylor v. Comm'r of Soc. Sec.*, No. 10-CV-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) (Michelson, M.J.), *report and recommendation adopted*, 2011 WL 2682892 (E.D. Mich. July 11, 2011) (Edmunds, J.); *see also Smith v. Halter*, 307 F.3d 377, 378-79 (6th Cir. 2001) (holding, where ALJ made a finding that the plaintiff "often" has difficulties in CPP, that the ALJ did not need to include talismanic language in his hypothetical, at least where the evidence demonstrated that the claimant's concentrational difficulties were negligible and ALJ limited the claimant to "routine and low stress" jobs that did not involve "high quotas").

This Court discussed the relevant case law at length in a recent report and recommendation, *White v. Comm'r of Soc. Sec.*, No. 12-12833, slip report and recommendation (E.D. Mich. Apr. 26, 2013) (Michelson, M.J.).[16] In sum, some cases suggest that an RFC limiting a claimant to "unskilled" or "simple, routine" work is not sufficient to account for "moderate" limitations in CPP because the claimant may have difficulty staying on task or keeping pace even when performing unskilled or simple, routine work, but other decisions have recognized that limiting a claimant to unskilled or simple, routine work is sufficient because at least some claimants with those limitations

---

[16]Objections to this Court's report and recommendation in *White* are pending.

can stay on task and keep pace when the work is simple—often, in those cases, the medical evaluation that assessed moderate CPP limitations also concluded that the claimant could perform unskilled work on a sustained basis.

Here, the ALJ stated that the "simple routine tasks" limitation was included "based on Dr. Briesmeister's opinion." (Tr. 16.) In the section of his opinion discussing the RFC, the ALJ summarized Dr. Briesmeister's opinion, including the test results showing "a poor verbal recognition and work decoding skills, a possible disorder of spelling and written expression, and mild mental impairment to the low range of borderline intelligence with a learning deficit in arithmetic comprehension and a developmental reading disorder" and Dr. Briesmeister's recommendation that "the claimant should consider routine, low stress, and academically undemanding jobs." (*Id.*) The ALJ gave Dr. Briesmeister's opinion "significant weight" and found that his "conclusion that the claimant should limit herself to routine, undemanding jobs combined with her allegations of not finishing what she started and difficulty following instructions justify a finding of moderate impairment of concentration persistence or pace." (*Id.*)

In this case, then, the ALJ based Manson's moderate CPP limitations and "simple routine tasks" RFC limitation on a medical source opinion that expressly indicated that Manson could work: Dr. Briesmeister stated that Manson "needs a routine, entry-level, and low stress job" and "a job that is academically undemanding." (Tr. 337.) Although Dr. Briesmeister limited the types of jobs she could do, his recommendation indicates that she could work, within those parameters. The ALJ's limitation to "simple routine tasks" sufficiently incorporates his recommendation. Notably, Manson has not suggested any specific language or additional limitation that should have been included in the RFC. Manson's argument that the "simple routine tasks" limitation in the RFC was insufficient

24

is not persuasive.

*Second*, as to the August 2009 consultative examinations, the Commissioner argues that "[b]ecause these reports post-date Plaintiff's date last insured by over one and one-half years, they have little if any probative value to the inquiry with which the ALJ was charged." (Def.'s Mot. Summ. J. at 10.) Plaintiff responds that this is "*post hoc* rationalization since the ALJ never mentioned these medical opinions in his decision, which is itself an error." (Pl.'s Reply at 5.) The ALJ stated that he "only considered the evidence up to the date last insured, as disability must be established prior to that date before later evidence becomes relevant." (Tr. 15.) Plaintiff also argues that "Dr. Rojas never tempor[ally] limited his assessed limitations to after the date last insured" although as a state agency consultant he would have understood the significance of that date. (Pl.'s Reply at 5-6.)

Manson was examined in August 2009 by internist Leonidas Rojas, M.D. (Tr. 315-17), and psychiatrist Basivi Baddigam, M.D. (Tr. 322-24), both at the request of the state Disability Determination Services. At the time, it appears that Manson's concurrent SSI claim—which did not depend on establishing disability on or before the DLI—was still pending. (Tr. 30, 47.) Nothing about Dr. Rojas's very sparse opinion—which states that "Mr. [*sic*] Manson has had multiple factors, as mentioned above which preclude her from performing any significant work-related activity" (Tr. 317), referring to bare-bones examination findings and clinical diagnoses (Tr. 316)—suggests it is anything but a snapshot of Manson's impairments at the time of examination. This Court is not persuaded by Manson's argument to the contrary.

Nor can Dr. Baddigam's psychiatric assessment be stretched to reach before the DLI. Dr. Baddigam expressly limited his opinion that Manson was unable to work to "the present t[im]e." (Tr.

324.) He did state that Manson "had auditory hallucinations and paranoid ideations for 20 years," but there he is reporting her history, not making a diagnosis. (Tr. 323.) There was no analysis, speculation, or opinion about the onset date of the mental illnesses he diagnosed. (Tr. 324.) Neither Dr. Baddigam's nor Dr. Rojas's consultative examination reports contain evidence relevant to Manson's condition on or before her DLI, and this Court therefore finds no error in the ALJ's failure to specifically discuss them. *See Wirth v. Comm'r of Soc. Sec.*, 87 Fed. App'x 478, 480 (6th Cir. 2003) ("Post-expiration evidence must relate back to the claimant's condition prior to the expiration of her date last insured.").

*Third*, Plaintiff's argument that the ALJ "failed to properly consider" her "documented obesity" is not persuasive. The ALJ noted that Manson "is morbidly obese" but "no medical doctor has rendered an opinion about any resulting functional limitations." (Tr. 16.) Manson points to Dr. Rojas's report, but—aside from the fact that his examination took place long after the date last insured—all Dr. Rojas says is that "Manson has had multiple factors . . . which preclude her from performing any significant work-related activity." (Tr. 317.) He did not opine specifically on the functional limitations of Manson's obesity. The ALJ acted within his discretion when he stated, "the undersigned reasonably assumes that obesity exacerbated claimant's hypertension and arthritis, but did not reduce her residual functional capacity beyond the degree of limitation caused by those impairments as exacerbated by her obesity." (Tr. 16.) As in *Coldiron v. Comm'r of Soc. Sec.*, 391 F. App'x 435 (6th Cir. 2010), the ALJ found that Manson's obesity was a severe impairment at step two and acknowledged that obesity contributed to her other medical conditions. 391 F. App'x at 443. The ALJ sufficiently considered Manson's obesity in formulating the RFC. *See Coldiron*, 391 F. App'x at 443 (holding that the ALJ adequately accounted for the effect that obesity had on

26

Coldiron's ability to perform sedentary work); *Bledsoe v. Barnhart*, 165 F. App'x 408, 412 (6th Cir. 2006) ("It is a mischaracterization to suggest that Social Security Ruling 02-01p offers any particular procedural mode of analysis for obese disability claimants.").

### D. Plaintiff's Remaining Arguments

In addition to the arguments addressed above, Manson argues (1) that the ALJ erred by relying on Section 201.00(h)(1) of the Medical-Vocational Guidelines, or the "grids," which do not account for non-exertional limitations (Pl.'s Mot. Summ. J. at 13-14); (2) that the ALJ rendered an improper credibility determination because he failed to communicate what weight he gave to Manson's statements (Pl.'s Mot. Summ. J. at 15); and (3) that he failed to consider the side effects of Manson's medications (Pl.'s Mot. Summ. J. at 15-16). The Court already has identified multiple errors requiring a reevaluation of all the evidence as a whole. *See supra* Parts IV.A-B. Plaintiff's remaining arguments should therefore be evaluated anew on remand, to the extent they are not obviated by new findings.

## V.  CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that remand is required so that the ALJ may (1) call a medical advisor or otherwise secure additional evidence by which to properly infer Manson's disability onset date, and (2) obtain an expert opinion regarding whether the listings for mental disorders, including Listing 12.04, have been met. The Court therefore RECOMMENDS that Plaintiff's Motion for Summary Judgment (Dkt. 12) be GRANTED, that Defendant's Motion for Summary Judgment (Dkt. 16) be DENIED, and that, pursuant to 42 U.S.C. § 405(g), the decision of the Commissioner of Social Security be REMANDED.

## VI.  FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

> s/Laurie J. Michelson
> LAURIE J. MICHELSON
> UNITED STATES MAGISTRATE JUDGE

Dated:  June 13, 2013

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on June 13, 2013.

> s/Jane Johnson
> Deputy Clerk